**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM SMITHSON, Plaintiff, | : | |
| v. | : | No. 2:26-cv-1638 |
| ANTHONY LETIZIO, DO, Defendant. | : | |

**O P I N I O N**
**Defendant's Motion to Dismiss, ECF No. 9 – Denied**

**Joseph F. Leeson, Jr.** **August 18, 2026**
**United States District Judge**

## I. INTRODUCTION

Plaintiff William Smithson, a prisoner at SCI Phoenix, filed suit against Defendant Anthony Letizio, DO, the prison's Medical Director, alleging that Letizio's actions caused a delay in Smithson's stage III metastasized anal cancer diagnosis. Smithson brings a claim of deliberate indifference in violation of the Eighth Amendment of the United States Constitution and a claim for professional medical negligence under Pennsylvania state law. Letizio has since filed a Motion to Dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the Motion will be denied.

## II. BACKGROUND

### A. Factual Background

Plaintiff William Smithson is an HIV+ prisoner at SCI Phoenix (the "prison") in Collegeville, Pennsylvania. Compl. ¶¶ 1, 8, ECF No. 1. Defendant Anthony Letizio, D.O., is a doctor employed at the prison, who also serves as the site's Medical Director. *Id.* ¶¶ 2, 10. In

August 2023, Smithson reported "to the medical providers at SCI Phoenix"[1] that he was experiencing "anal pain." *Id.* ¶ 9. Later, on January 9, 2024, Smithson reported a lump at the top of his buttocks to a P.A.[2] at the prison, who "assessed him with an 'unspecified external anal sphincter lump.'" *Id.* ¶ 10. This P.A. spoke with Letizio about the lump, who advised Smithson to "avoid aggravating the area." *Id.* Smithson was not provided with a treatment plan. *Id.*

On January 23, 2024, Smithson reported to another P.A. that he had "a cyst in his anus which was causing him pain." *Id.* ¶ 11. The P.A. concluded that Smithson's condition was "most likely hemorrhoids," prescribed him an antibiotic, *id.* ¶ 12, and noted that Smithson also had anal warts, *id.* ¶ 13. Smithson suggests that HPV, or Human Papillomavirus, could have been the cause of his anal warts, but the P.A. did not order further evaluation or treatment. *Id.* ¶ 13.

On February 12, 2024, Smithson was evaluated by Certified Registered Nurse Practitioner (CRNP) Ashley Senkowski (hereinafter "Nurse Senkowski") for "an open, non-draining cyst which was located directly above his anus." *Id.* ¶ 14. Nurse Senkowski gave Smithson bandages, another antibiotic, and a referral for wound care. *Id.* ¶ 15. On March 8, 2024, Smithson again saw Nurse Senkowski, whose "treatment plan was to schedule incision and drainage since previous antibiotics were not effective" in treating the cyst. *Id.* ¶ 16. Yet Smithson says, "there is no record that this incision and drainage ever took place." *Id.* ¶ 17. On July 8, 2024, Smithson was examined by CRNP Susan Miller (hereinafter "Nurse Miller") who "noted his cyst was causing pain and difficulty urinating, and had been open and draining pus since March, with increased pain." *Id.* ¶ 18. Nurse Miller "noted that the area above his rectum was

---

[1] All other medical personnel mentioned in the factual background (not including surgeons, oncologists, and specialists) work at SCI Phoenix, unless otherwise indicated.

[2] The Complaint mentions several "PAs" who treated Smithson at the prison. The Court notes that the term "P.A." is often used in the medical context to refer to a Physician's Assistant and assumes the same meaning here.

inflamed, angry red, [and] fluctuant, with a small amount of bloody drainage." *Id.* ¶ 19. After speaking with Letizio, Nurse Miller recommended a consultation with general surgery, *id.*, and placed a referral for surgical consultation, *id.* ¶ 20. Letizio signed that referral the next day. *Id.*

On August 9, 2024, a general surgeon "assessed [Smithson] with an anal fistula, an abnormal tunnel to the tissues connecting the anus to the surrounding skin, [and] planned for an outpatient fistulotomy[,] a surgical procedure to remove a fistula, by laying open the entire impacted tract to allow the area to heal." *Id.* ¶ 21. Yet, "Smithson was not scheduled for a general surgery appointment at Einstein Hospital until January 24, 2025," over five months later. *Id.* ¶ 22. Between August 2024 and January 2025, "Smithson repeatedly reported significant pain to the prison medical providers, including [on] August 23, September 6, October 10, November 4, November 8, November 25, and December 12." *Id.* ¶ 23.

On October 4, 2024, Smithson attended an appointment at the Temple University HIV Clinic. *Id.* ¶ 24. Jennifer Aldrich, MD, evaluated Smithson and noted: "Given history of anal Human Papilloma Virus, should also see Juan Poggio (colorectal) at Jeanes Hospital for anal cancer screening (needs a surgeon trained in high resolution anoscopy)." *Id.* Letizio "signed off on this note the same day, but did not order an anal cancer screening nor follow-up with a colorectal surgeon." *Id.* ¶ 25. Instead, on October 8, 2024, Letizio referred Smithson to "general surgery," noting: "Inmate with confirmed anal fistula. Continued draining and erythema. Saw general surgery initially and they would like to proceed with the fistulectomy. The general surgeon he has previously gone to now retired and the new surgeon would like an initial evaluation prior to doing the surgery." *Id.* ¶ 26.

On November 4, 2024, Smithson told Nurse Senkowski that he had "severe pain in his anal area" and difficulty sitting. *Id.* ¶ 28. On November 8, 2024, Smithson told Nurse Miller that

he "was having trouble urinating due to his anal fistula," and Nurse Miller ordered him a medication to relax the prostate and bladder muscles. *Id.* ¶ 29. On November 12, 2024, Smithson was "again seen for a general surgery consult," but was told that he "would require surgical consultation at Einstein Hospital in Philadelphia." *Id.* ¶ 31 (internal quotations omitted). On November 25, 2024, Smithson reported to CRNP Glenese Newsome (hereinafter "Nurse Newsome") on a sick call, complaining of anal pain and pain in his right testicle. *Id.* ¶ 32. Nurse Newsome found an enlarged lymph node in Mr. Smithson's groin. *Id.* On December 12, 2024, Smithson again saw Nurse Newsome, complaining of anal pain and left groin pain. *Id.* ¶ 33. Smithson requested adult diapers to "control his fecal incontinence and the draining from the fistula." *Id.* (internal quotations omitted). On January 9, 2025, Smithson again reported to Nurse Newsome, complaining of constipation "due to his fistula." *Id.* ¶ 34. Nurse Newsome "discussed the case with Dr. Letizio [and] a stool softener and ibuprofen were ordered." *Id.*

On January 24, 2025, Smithson underwent his scheduled surgery, which consisted of "incision, debridement of abscess and fistulotomy by Richard Greenberg, MD." *Id.* ¶ 35. After the operation, Dr. Greenberg said Smithson had a "high probability of malignancy," and that his exam "demonstrated a complex posterior infection with mass-like qualities at its base," including "a deep mass like infiltration into the posterior wall of the anal canal. . . . [t]he skin bridges were excised and sent for pathologic examination, underlying this was a deep base appearing with a high probability of neoplasia." *Id.* ¶ 36. Smithson alleges that this "post-operative diagnosis" suggested that his condition was most likely cancerous. *See id.* On January 29, 2025, Einstein Healthcare Network issued a final pathology report, which confirmed that Smithson suffered from "invasive squamous cell carcinoma." *Id.* ¶ 37.

On February 7, 2025, Smithson was evaluated by an oncologist to determine the treatment plan for his "newly diagnosed anal cancer." *Id.* ¶ 38. The oncologist observed that Smithson had "ongoing pus filled drainage" and ordered an "urgent CT of the abdomen and pelvis as well as an urgent MRI of the pelvis," instructing Smithson to follow up in four weeks to plan and begin treatment. *Id.* ¶ 38 (internal quotations omitted). This oncologist "sent printed orders for the CT and MRI back to the prison" with Smithson. *Id.* ¶ 39. On February 13, 2025, Smithson had a follow-up appointment with his surgeon, Dr. Greenberg, who examined Smithson and noted a "[l]arge area of tumor with eradicated necrotizing top layer of tissue - open area with inflamed surrounding tumor." *Id.* ¶ 40. Dr. Greenburg ordered "follow-up with radiation and medical oncology and CT and MRI imaging to rule out metastasis." *Id.* ¶ 41. The next day, Smithson went to see Nurse Senkowski at the prison, complaining of rectal pain. *Id.* ¶ 42. Nurse Senkowski noted that naproxen and Tylenol were "minimally effective" in treating Smithson's pain, and prescribed him Percocet. *Id.*

On February 28, 2025, Smithson saw Dr. Alrich at the Temple University HIV clinic, who made the following appointment notes: "status post anal fistulotomy 1/24/25 at AEMC - diagnosed with anal cancer at that time (this was after an 8 month delay)." *Id.* ¶ 43. Dr. Alrich's treatment plan read: "New diagnosis of anal cancer - needs MRI/CT ASAP - this has not been scheduled." *Id.* ¶ 44. On March 4, 2025, Smithson reported to a P.A. at the prison that he was experiencing "extreme amounts of rectal pain and inability to sit well," and requested a "foam cushion or donut to sit on to help with the rectal pain, as well as an increase in his pain medication." *Id.* ¶ 45. The P.A. noted that she "discussed these requests with Dr. Letizio and per his orders 'will not be providing any cushions or increase in current pain medications.'" *Id.* On

March 7, 2025,[3] the Einstein Cancer Center noted that Mr. Smithson's tumor had grown larger, expressed concern that it could be a "progressive tumor," and noted that Smithson "still needed a CT of his chest and abdomen as well as an MRI of his pelvis to complete his cancer staging, and that his pain was not being well controlled." *Id.* ¶ 46. That same day, upon Smithson's return to the prison, Registered Nurse Beth Stuebner (hereinafter "Nurse Stuebner") reviewed the report from the Einstein Cancer Center and noted the following: "Pain is not well controlled. Increase Percocet or add gabapentin/Cymbalta. Please give him a pad to help sit." *Id.* ¶ 47. On March 11, 2025, Smithson again reported significant pain to a prison P.A., who consulted with Letizio and then "advised [Smithson] that as per last discussion with the Site medical Director, that if he is in that much pain, he can go to the infirmary for treatment." *Id.* ¶ 48.

On March 12, 2025, Smithson underwent a CT scan of his chest at Einstein Healthcare Network, which showed "several scattered lung nodules measuring between 2 and 4 mm." *Id.* ¶ 49. The radiology report recommended "short-term CT chest follow up per oncologic protocol." *Id.* On March 21, 2025, Smithson underwent an MRI of his pelvis at Einstein Healthcare Network, which showed "an 8.5 cm lobulated anal mass consistent with anal cancer" and "multiple mildly enlarged perirectal lymph nodes most likely representing metastatic lymphadenopathy." *Id.* ¶ 50. Smithson alleges that "[t]hese findings were consistent with Stage 3 cancer." *See id.* On April 4, 2025, Smithson saw another oncologist, Dr. Goldstein, who confirmed that Smithson had "stage IIIA cancer," as well as "iron deficiency anemia due to chronic blood loss and multiple scattered small lung nodules." *Id.* ¶¶ 51-52. The same day, Smithson was evaluated by a P.A. at the prison for significant pain and constipation; the P.A

[3] The Complaint notes this date as "March 7, 2024," but given the placement of this fact in Smithson's chronological list of facts, the Court assumes the year is a typographical error and Smithson meant to say "March 7, 2025." *See* Compl. ¶ 46.

noted that Smithson "had been referred by psychology because he was 'an extreme[] suicide risk due to his chronic pain.'" *Id.* ¶ 53. On April 19, 2025, Smithson asked Nurse Stuebner to look at his tumor because he could not use the restroom. *Id.* ¶ 54. She noted that she was "[u]nable to visualize [Smithson's] rectum due to tumor size. Tumor increased in size from last time visualized by nursing. Inmate in 10/10 pain," and sent Smithson to the emergency room, due to "rapid growing rectal tumor; increased in size approximately 5 times in one month." *Id.* The local hospital's emergency department ruled out a blockage, treated Smithson for pain, and released him. *Id.* ¶ 55.

On April 22, 2025, Smithson had a chemotherapy port placed so he could begin his chemotherapy treatments. *Id.* ¶ 56. He completed his chemotherapy and radiation treatments on June 11, 2025. *Id.* ¶ 57. Smithson alleges that he "exhausted his administrative remedies on June 25, 2025," *id.* ¶ 70, and that "[i]n response to his grievance that the medical staff had delayed diagnosis and treatment of his cancer, he was told that 'appointments were ordered and scheduled timely according to the medical records in relation to this situation. Your request for monetary compensation . . . is denied. Your grievance is denied,'" *id.* ¶ 71.

**B. Procedural History**

On March 13, 2026, Smithson filed a Complaint in this Court against Letizio, alleging that Letizio was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment (Count I), and that Letizio was negligent in his treatment of Smithson (Count II). *See* Compl., ECF No. 1. In the Complaint, Smithson alleges that Letizio violated the professional standard of care, either through his own actions or those of his prison medical staff, by: failing to send him for an HPV evaluation or treatment, based on his anal warts, in January 2024, *see id.* ¶¶ 11-13; 64-65; by failing to "order an anal cancer screening [and to] follow-up with a colorectal surgeon," as directed by Dr. Aldrich of the Temple University HIV Clinic in early

October 2024, *id.* ¶¶ 24-25; *see also id.* ¶ 67, instead sending Smithson to a consultation with "general surgery," *id.* ¶¶ 27; 66, and by failing to promptly schedule an MRI and CT scan post-surgery, as ordered, to determine the degree to which his cancer had metastasized, *id.* ¶¶ 38-50. Smithson alleges that Letizio's actions delayed him from getting the specialist treatment he needed, placing him "in exactly the same predicament he had occupied . . . on July 8, 2024, when he was referred for evaluation by a general surgeon." *Id.* Smithson further alleges that Letizio was made aware of Smithson's signs of cancer in the Fall of 2024 (such as Smithson's history of HPV, *id.* ¶ 24, anal warts, *id.* ¶ 13, "[u]rinary retention and hesitancy," *id.* ¶ 30, "[e]nlarged pelvic lymph nodes," *id.* ¶ 32, proneness for neoplasia, *id.* ¶ 36, and increased pain, constipation, and incontinence, *id.* ¶ 68), had recognized Smithson's increased risk for cancer, *id.* ¶ 60, and failed to take prompt action to ensure that Smithson was seen by the proper specialist, surgeon, or medical professional earlier on. Smithson asserts that "[h]ad [his] cancer been diagnosed and treated promptly, it likely would not have progressed to stage III(A), and his long-term survival rate would have been higher." *Id.* ¶ 69.

On June 1, 2026, Letizio filed a Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). *See* Motion, ECF No. 9; Def. Br., ECF No. 9-1. In it, Letizio argues that Smithson's claims against him do not rise to the level of deliberate indifference, because prison medical officers have wide discretion in treating prisoners and Smithson has not alleged personal involvement by Letizio. *See id.* Letizio also asserts that a "portion of" Smithson's alleged injuries falls outside of the statute of limitations. *See id.* Smithson filed a Response in Opposition to the Motion to Dismiss on June 11, 2026. *See* Resp. ECF No. 10. This matter is now fully briefed and ready for decision.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6) Failure to State a Claim – Review of Applicable Law

In rendering a decision on a motion to dismiss, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "[I]n light of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." *Phillips*, 515 F.3d at 232 (citing *Twombly*, 550 U.S. at 555 n.3). *See also* Fed. R. Civ. P. 8(a) (requiring the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Also, "a

document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted). The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B. 42 U.S.C. § 1983 Claims – Review of Applicable Law**

Section 1983 of Title 42 of the United States Code is the vehicle by which federal constitutional claims may be brought in federal court. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Additionally, a "defendant in a civil rights action must have personal involvement in the alleged wrongs." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Moreover, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

"In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury." *Sameric Corp. v. Cty. of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998). The statute of limitations for personal injury actions in Pennsylvania is two years. *See id.*; 42 Pa. Cons. Stat. § 5524. "A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp.*, 142 F.3d at 599. "Rule 15(c) can ameliorate the running of the statute of limitations on a claim by making the amended claim relate back to the original, timely filed complaint." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001). The Rule provides: an "amendment to a pleading relates back to

the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin Ctny. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984).

### C. Deliberate Indifference to Serious Medical Need in violation of Eighth Amendment – Review of Applicable Law

To state an Eighth Amendment claim for inadequate medical care, "a prisoner must make (1) an 'objective' showing that the prisoner's medical needs were sufficiently serious and (2) a 'subjective' showing that the prison official acted with a sufficiently culpable state of mind." *Mitchell v. Gershen*, 466 F. App'x 84, 86 (3d Cir. 2011). The evidence must show the existence of (1) "a serious medical need" and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation omitted). Such a claim "states a cause of action under § 1983." *Id.* at 105.

A medical need is considered "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Mitchell*, 466 F. App'x at 86 (quoting *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). The consequences of denying care for an inmate's medical need may also be an indicator of its seriousness. *See id.*

Deliberate indifference occurs when a prison official knows of and disregards an excessive risk to a prisoner's health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Examples of deliberate indifference include "where a prison official knows of a prisoner's need for medical treatment but intentionally refuses to provide it, delays necessary medical treatment for a non-medical reason, or prevents a prisoner from receiving needed medical treatment." *Lopez v. Correctional Med. Servs., Inc.*, 499 F. App'x 142, 146 (3d Cir. 2012) (citing *Rouse*, 182 F.3d at 197); *see also Rouse*, 182 F.3d at 197 ("Deliberate indifference[] requires obduracy and wantonness . . . which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.'" (cleaned up; citation omitted)). Additionally, the deliberate failure to provide prescribed medical care, the choice of an ineffective course of treatment in contravention of another physician's explicit orders, or the choice of an "easier and less efficacious treatment," may establish deliberate indifference. *Rodriguez v. Smith*, No. 03-cv-3675, 2006 WL 680965, at *13 (E.D. Pa. March 16, 2006) (citation omitted).

Mere allegations of "medical malpractice, negligence, and courses of treatment inconsistent with the desires of the prisoner, though, do not constitute deliberate indifference." *Lopez*, 499 F. App'x at 146; *see Mitchell*, 466 F. App'x at 87; *Lanzaro*, 834 F.2d at 346. Nor does "the refusal to summon the medical specialist of the inmate's choice, perform tests or procedures that the inmate desires, or to explain to the inmate the reason for medical action or inaction" amount to cruel and unusual punishment. *Roman v. Little*, No. 19-cv-5204, 2020 WL 2098096, at *4 (E.D. Pa. April 30, 2020) (citation omitted). Prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, *Young v. Kazmerski*, 266

F. App'x 191, 194 (3d Cir. 2008), and courts are reluctant to second guess those medical judgments, *see Mitchell*, 466 F. App'x at 87; *James v. Pennsylvania Dep't of Corr.*, 230 F. App'x 195, 197–98 (3d Cir. 2007). Thus, an inmate's difference of opinion with his medical provider as to his treatments, without more, does not support a finding of deliberate indifference. *See id.*; *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("[M]ere disagreements over medical judgment do not state Eighth Amendment claims.").

**D. Negligence – Review of Applicable Law**

"A plaintiff must prove four elements to establish negligence by a defendant: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Toro v. Fitness Int'l LLC.*, 150 A.3d 968, 976–77 (2016). "Whether the defendant owed a duty of care under the first element is a question of law." *Sabric v. Martin*, 532 F. App'x 286, 289 (3d Cir. 2013) (citing *Matharu v. Muir*, 29 A.3d 375, 384 (Pa. Super. Ct. 2011)). Gross negligence "is a form of negligence where the facts support substantially more than ordinary carelessness." *See Brandow Chrysler Jeep Co. v. Datascan Techs.*, No. 06-5093, 2008 WL 4274494, at *4 (E.D. Pa. Sep. 17, 2008), *aff'd*, 346 F. App'x 843 (3d Cir. 2009). It is an intentional tort. *See Hickenbottom v. Nassan*, No. 03-223, 2007 WL 7753803, at *24, 42 (W.D. Pa. Mar. 29, 2007).

**1. Professional (Medical) Negligence**

Although the basic elements of negligence and medical malpractice are the same, medical "malpractice involves the 'unwarranted departure from the generally accepted standards of medical practice resulting in injury to the patient, including all liability-producing conduct arising from the rendition of professional medical services.'" *Doe v. Hosp. of Univ. of Pennsylvania*, 546 F. Supp. 3d 336, 344 (E.D. Pa. 2021) (quoting *Grossman v. Barke,* 868 A.2d 561, 566 (Pa. Super. Ct. 2005)). "A complaint sounding in professional versus ordinary

negligence deals primarily with the breach of a professional standard of care." *Id.* (quoting *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 507 (Pa. 2009)). Such claims turn on "questions involving medical judgment," and thus, most medical malpractice cases will require expert testimony. *Id.* (internal citations omitted). To determine whether a claim sounds in ordinary negligence or medical malpractice, a court must ask two fundamental questions: "(1) whether the claim pertains to an action that occurred within the course of a professional relationship," and "(2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Id*. at 345 (quoting *Grossman*, 868 A.2d at 570). "If both these questions are answered in the affirmative, the action is subject to the . . . requirements that govern medical malpractice actions." *Id*. To state a claim for medical or professional negligence, a plaintiff must show: (1) that the defendant "owed a duty" to plaintiff, a patient; (2) that the defendant "breached that duty through an 'unwarranted departure from the generally accepted of medical practice'"; (3) that "the breach was the direct and proximate cause of the harm suffered"; and (4) that the plaintiff suffered damages as a direct result of the harm. *See Sparkman v. Potter Cnty.*, No. 4:24-cv-01338, 2025 WL 2989499, at *3 (M.D. Pa. Oct. 23, 2025) (citing *Doe*, 546 F. Supp. 3d at 344-45); *Hickey v. Merritt-Scully*, No. 18-cv-1793, 2022 WL 883851, at *7 (M.D. Pa. Mar. 24, 2022)).

## IV. ANALYSIS

### A. Statute of Limitations

Letizio argues that the statute of limitations has run on "any and all of [Smithson]'s claims and/or causes of action" because his pain began as early as 2023, and the Complaint in this action was not filed until 2026. *See* Def. Br. 8. "In actions under 42 U.S.C. § 1983, federal courts apply the state's statute of limitations for personal injury." *Sameric Corp.*, 142 F.3d at 599. The statute of limitations for personal injury actions in Pennsylvania is two years. *See id.*;

42 Pa. Cons. Stat. § 5524(7). However, the federal Prison Litigation Reform Act ("PLRA") states, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In other words, the PLRA "tolls Pennsylvania's statute of limitations while a prisoner exhausts administrative remedies." *Pearson v. Secretary Dept. of Corrections*, 775 F.3d 598, 603 (3d Cir. 2015); *see generally Ross v. Blake*, 578 U.S. 632 (2016).

"A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp.*, 142 F.3d at 599. Here, Smithson's claim is rooted in the theory that his cancer diagnosis would have been less severe, and would have not progressed as far, had it been identified earlier. Thus, the Court finds that his cause of action "accrued" upon Smithson receiving his cancer diagnosis for the first time. On January 24, 2025, Smithson underwent his scheduled surgery, Compl. ¶ 35, after which Dr. Greenberg said Smithson had a "high probability of malignancy," *id.* ¶ 36. This gave Smithson the impression that his condition was most likely cancerous, but it was not until January 29, 2025, when Einstein Healthcare Network issued a final pathology report, that it was confirmed that Smithson suffered from "invasive squamous cell carcinoma." *Id.* ¶ 37. Thus, the Court finds that the statute of limitations began to run on January 29, 2025. That being the case, whether the statute of limitations was also tolled while Smithson exhausted his prison administrative remedies matters not,[4] because his Complaint in this case was filed on March 13, 2026, which is well within two years from January 29, 2025. Smithson's claims fall within the statute of limitations.

4 Smithson does not indicate when he filed his first prison grievance, but the Court presumes it was not until after the completion of his chemotherapy, on June 11, 2025. Compl. ¶ 57. Smithson alleges that he fully exhausted his administrative remedies on June 25, *id.* ¶ 70, and Letizio does not

B. **Deliberate Indifference to Serious Medical Need in violation of Eighth Amendment**

In the medical context, "an inadvertent failure to provide adequate medical care" may not rise to the level of repugnance required to "state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 105-06. However, allegations of "persistent conduct in the face of resultant pain and risk of permanent injury" do rise to such a level, as it is reasonable to infer from such facts that a doctor was deliberately indifferent to a prisoner's medical needs. *See White*, 897 F.2d at 109.

"[P]rison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017), and thus "mere disagreements over medical judgment do not state Eighth Amendment claims." *White*, 897 F.2d at 110. Therefore, to establish a violation of his Eighth Amendment right to adequate medical care, Smithson "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicated deliberate indifference to that need." *Natale*, 318 F.3d at 580-581.

1. **Serious Medical Need**

A medical need is considered "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Mitchell*, 466 F. App'x at 86 (quoting *Lanzaro*, 834 F.2d at 347). Here, Smithson was diagnosed with stage III metastatic anal cancer. Courts within the Third Circuit often forego a discussion of "serious medical need" in cases involving similar conditions, oftentimes because the seriousness of cancer is considered common knowledge, *see, e.g.*, *Allen v. Montgomery Cnty.*, No. 09-cv-1458, 2009 WL 4042761, at *7

dispute this. Hence, the Court finds that, to the extent the statute of limitations was tolled, it was likely tolled between June 11, 2025, and June 25, 2025.

(E.D. Pa. Nov. 19, 2009) (finding that a prisoner's rectal cancer was a serious medical need) *Jackson v. Fauver*, 334 F. Supp. 2d 697, 710 (D.N.J. 2004) ("There is no doubt that prostate cancer is a serious medical problem."), or because the parties have stipulated or otherwise agreed that the plaintiff's condition is serious, *see, e.g.*, *Jones v. Noel*, No. 22-2992, 2024 WL 1715406, *2 (3d Cir. April 22, 2024) ("The parties agree that [the plaintiff's] Hepatitis C is a serious medical need."); *Pagliaroli v. New Jersey Dep't of Corr.*, No. 18-12412, 2020 WL 1272121, at *6 (D.N.J. Mar. 17, 2020) ("The seriousness of Plaintiff's [bladder cancer] does not appear disputed in this case."). Here, Letizio does not dispute whether Smithson's anal cancer constitutes a serious medical need. Plus, the numerous prison complaints submitted by Smithson "describe a condition so persistent and painful that any lay person would easily recognize the necessity for a doctor's attention." *Allen*, 2009 WL 4042761, at *7 (internal quotations omitted) (finding that a prisoner's rectal cancer constituted a serious medical need). Thus, this Court finds that Smithson's condition constitutes a serious medical need.

2. **Deliberate Indifference**

The Third Circuit has indicated that deliberate indifference exists where "(1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017) (citing *Lanzaro*, 834 F.2d at 347). Here, Smithson asserts that Letizio acted with deliberate indifference when he "failed to ensure that Mr. Smithson received adequate medical care and/or was timely scheduled for all medical diagnostic tests and procedures, surgical consultations and surgeries," Compl. ¶ 77, "failed to ensure that the recommendations of Mr. Smithson's outside providers were appropriately considered and

followed," *id.* ¶ 78, and "failed to ensure that Mr. Smithson's cancer was timely diagnosed," *id.* ¶ 79. This Court agrees that these facts support an Eighth Amendment claim.

Here, when viewed in the light most favorable to Smithson, the factual allegations support an inference that Letizio was deliberately indifferent to Smithson's serious medical needs. Smithson's complaints of anal pain began as early as August of 2023, *id.* ¶ 9, and increased over time in both frequency and severity. In January of 2024, Smithson first reported a lump in his buttocks, which a P.A. at the prison labeled an "unspecified external anal sphincter lump." *Id.* ¶ 10. Letizio was notified of this lump, but merely told Smithson to "avoid aggravating the area"—he did not evaluate Smithson himself, did not instruct anyone to monitor the lump over time, and did not suggest a treatment plan. *See id.* Over the course of the next six months, Smithson was seen by various medical personnel at the prison to treat "an open, non-draining cyst" in or around his anus, which was growing increasingly painful and accompanied by anal warts; the only treatments prescribed were bandages, antibiotics, and a referral for wound care. *Id.* ¶¶ 11-18. Letizio contends that such treatments are sufficient to show that this case is not one of deliberate indifference, because "some level of medical care has been offered to the inmate." *See* Def. Br. at 6. Yet, the fact that "a prisoner received some form of medical treatment does not preclude a finding of deliberate indifference." *Allen*, 2009 WL 4042761, at *6 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). It is the defendant's *intent* that matters, *see Durmer*, 991 F.2d at 68, and the facts here support an inference that Letizio was indifferent to Smithson's condition, both before and after his cancer diagnosis was confirmed.

It was not until July of 2024 that Letizio signed a referral to send Smithson to a consultation with general surgery. Compl. ¶¶ 18-20. In August, the general surgeon discovered that Smithson had an anal fistula and arranged an outpatient fistulotomy, to occur on January 24,

2025. *See id.* ¶¶ 21-22. In the five months between Smithson's consultation with general surgery and his fistulotomy, he "repeatedly reported significant pain to the prison medical providers" who worked under Letizio. *Id.* ¶ 23. He was also evaluated by Dr. Aldrich at the Temple University HIV Clinic, *id.* ¶ 24., who, crucially, recommended that Smithson see a *specific* colorectal surgeon (Juan Poggio at Jeanes Hospital) for an anal cancer screening because Smithson "need[ed] a surgeon trained in high resolution anoscopy." *Id.* ¶ 24. Letizio "signed off on this note" from Dr. Aldrich on October 4, 2024, but *did not order an anal cancer screening* nor a follow-up with a colorectal surgeon. *See id.* ¶ 25. Instead, Letizio sent Smithson back to general surgery to meet with the new surgeon who was to perform his fistulotomy in January. *Id.* ¶ 26. Letizio's notes and referral to general surgery make no mention of Dr. Aldrich's recommendation to screen Smithson for cancer; it was simply disregarded. *See id.* ¶¶ 26-27.

Over the next two months, Smithson experienced increased pain in his anus and groin, developed an enlarged pelvic lymph node, and reported bouts of constipation and/or fecal incontinence. *Id.* ¶¶ 32-34. In response, Letizio ordered Smithson a stool softener and ibuprofen. *Id.* ¶ 34. Letizio did not investigate the lymph node, despite being aware of Smithson's history of HIV and being put on notice two months earlier by Dr. Aldrich that Smithson was exhibiting signs of cancer. *Id.* ¶ 25. Following the fistulotomy surgery in January 2025, Smithson received the cancer diagnosis he had feared: "invasive squamous cell carcinoma." *Id.* ¶ 37. In early February 2025, Smithson met with his surgeon and an oncologist, both of whom ordered that Smithson get a CT scan and MRI immediately, to determine the spread of his cancer and allow them to develop a treatment plan. *Id.* ¶¶ 38-41. These "urgent" orders were sent to the prison in writing, *see id.* ¶ 39, but the scans were not scheduled until the end of March 2025, *id.* ¶¶ 49-50. According to other medical personnel, this was much too late. On February 28, 2025, Dr. Aldrich

of the Temple University HIV clinic noted that Smithson was "diagnosed with anal cancer" following "an 8 month delay" without preventative cancer treatment, and that Smithson needed an "MRI/CT ASAP" which had "not been scheduled" yet. *Id.* ¶¶ 43-44. As of March 4, 2025, Smithson was complaining of "extreme amounts of rectal pain and inability to sit well," but Letizio refused to modify his pain medications and refused to provide even a cushion or donut for Smithson to sit on, *id.* ¶ 45, despite the pleas by other medical staff that he do so, *id.* ¶ 47. By March 11, 2025, the MRI and CT scans still had not been conducted, and despite being notified numerous times of Smithson's worsening pain, Letizio did nothing; he even had a P.A. tell Smithson "that if he is in that much pain, he can go to the infirmary for treatment." *See id.* ¶ 48.

Overall, the facts indicate that Letizio was aware of Smithson's high susceptibility to anal cancer, but that he failed to act on that knowledge, despite being prompted by other specialists to schedule cancer screenings and oncology evaluations for Smithson as early as October 2024. Letizio did not act promptly in scheduling any of Smithson's specialist consultations or preventative cancer screenings, and, once aware of Smithson's eventual anal cancer diagnosis, Letizio failed to promptly schedule CT and MRI scans, which were necessary to determine the degree to which his cancer had metastasized and to determine a treatment plan. As the Medical Director at the prison, Letizio had the final say in whether these treatment recommendations were followed or not. Smithson's stage III cancer diagnosis should have come as no surprise to Letizio, given Smithson's onslaught of worsening symptoms and unmanageable pain in the preceding year. Smithson's symptoms were evident and Letizio was put on notice that a substantial risk of serious harm (cancer) existed, yet he chose not to mitigate that risk. *See Pearson v. Prison Health Serv.*, 850 F.3d at 541. This supports an inference that Letizio deviated from professional standards of care. *See id.* While discovery may reveal more about the intent

behind Letizio's treatment decisions, at this stage Smithson has pleaded enough information from which the Court can plausibly infer that Letizio either intentionally refused to provide necessary cancer treatment, or delayed necessary medical treatment for non-medical reasons. *See Lopez*, 499 F. App'x at 146. Collectively, the Court finds the allegations in the Complaint sufficient to state a claim for deliberate indifference to Smithson's serious medical needs. The Motion to Dismiss Count I is denied.

C. **Professional Negligence**[5]

Letizio's relationship with Smithson was that of medical provider and patient. Smithson alleges that, as an inmate, he was "unable to procure his own medical care and was totally dependent on the prison medical staff to order him appropriate diagnostic care and treatment." Compl. ¶¶ 7-8. Taken as true, this indicates that Letizio owed Smithson a duty of care. *See Doe*, 546 F. Supp. 3d at 344-45. Moreover, Smithson's injuries, as outlined above, are evident; his worsening pain and the development of lymph nodes and lumps, which quickly grew malignant, would be enough—even absent his later cancer diagnosis—to demonstrate that Smithson suffered damages. *See id.* Still, to state a plausible claim for professional medical negligence, Smithson must show that Letizio breached that duty owed by departing from the generally accepted standard of medical practice, and that "the breach was the direct and proximate cause of

[5] Under Pennsylvania law, plaintiffs who bring professional negligence claims must also file a certificate of merit. *See* Pa. R. Civ. P. 1042.3. In 2011, the Third Circuit applied Pennsylvania's Rule 1042.3 to state-law medical-malpractice claims brought in federal court, finding that it constituted state substantive law under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). *See Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011); *see also Schmigel v. Uchal*, 800 F.3d 113 (3d Cir. 2015). However, the United States Supreme Court, in *Berk v. Choy*, 607 U.S. 187 (2026), "just abrogated that precedent, holding that Delaware's analogous requirement did not apply in federal court." *DiFraia v. Ransom*, 171 F.4th 622, 633 (3d Cir. 2026) (citing *Berk*, 607 U.S. 187). Recently, the District Court for the Middle District of Pennsylvania adopted the reasoning in *Berk* and found that Pennsylvania Rule 1042.3 no longer applies in federal court. *See Allen v. Voorstad*, No. 3:25-cv-106, 2026 WL 184276, at *3 (M.D. Pa. Jan. 23, 2026). This Court follows suit, and declines to dismiss Smithson's state law professional negligence claim for failure to file a certificate of merit.

the harm suffered." *See Sparkman*, 2025 WL 2989499, at *3 (citing *Doe*, 546 F. Supp. 3d at 344-45; *Hickey*, 2022 WL 883851, at *7).

As demonstrated above, the notes from HIV specialist Dr. Aldrich, and later, Smithson's oncologist, show that Letizio's actions—namely, failing to send Smithson to a specialist or to schedule a cancer screening prior to his fistulotomy, and failing to promptly schedule an MRI and CT scan thereafter—likely violated the professional standard of care. *See Doe*, 546 F. Supp. 3d at 344-45. These actions occurred over the course of Smithson's relationship with Letizio, while Letizio served as his medical provider and the prison's Medical Director. Whether Letizio exhibited sound medical judgment is not for this Court to decide, though the facts suggest that at least two other medical professionals thought that Letizio's course of treatment was dilatory and deficient. It is not inconceivable that earlier detection may have resulted in a cancer diagnosis less caustic and debilitating than stage III metastatic anal cancer. Even so, this is a case in which expert testimony is likely to play a large part. At this stage, however, Smithson has alleged enough facts to state a plausible claim for professional negligence against Letizio, and it would be premature to dismiss such a claim. Accordingly, the Motion to Dismiss Count II will be denied.

## V. CONCLUSION

For the foregoing reasons, the Court denies Letizio's Motion to Dismiss. The Court finds that Smithson alleges sufficient facts in support of his claims for deliberate indifference under the Eighth Amendment and for professional negligence.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*___________
JOSEPH F. LEESON, JR.
United States District Judge